S96A0605. HAWES v. THE STATE.
(470 SE2d 664)

SEARS, Justice.

Gary Anderson Hawes appeals from his conviction for felony murder. We find no error in the trial court's denial of a special demurrer which sought to strike the use of Hawes' alias name from the indictment. Furthermore, assuming without deciding that the trial court erred by admitting a criminal contempt order into evidence for purposes of witness impeachment, we find any resulting error to have been harmless. We also find the trial court's recharge to the jury that it could consider a count charging felony murder after deadlocking on a count charging malice murder to be satisfactory under *Edge v. State.*[1] Therefore, we affirm.[2]

The evidence introduced at trial showed that while socializing at an apartment complex, Hawes accompanied a young woman, Ms. Howard, to an apartment in the complex so that she could retrieve her child. The child was in the apartment with his father, an African-American, who would become Hawes' victim. Hawes and the victim got into a fight, and Hawes' co-defendant eventually joined in the fray. While a number of onlookers stood by, some of them shouting encouragement to Hawes, Hawes struck the victim in the back of the head with an aluminum baseball bat, knocking him to the ground.

[4] The question of whether or not the Georgia court retains jurisdiction of either the petition for modification of custody or for support is not before us.
[1] 261 Ga. 865 (414 SE2d 463) (1992).
[2] The murder took place on February 25, 1995, and Hawes was indicted on March 29, 1995 for murder and felony murder, with aggravated assault being the underlying felony. The trial began on June 19, 1995, and on June 22, 1995, the trial court found that the jury had deadlocked on the charge of murder, and accepted the jury's guilty verdict on the charge of felony murder. Hawes was sentenced by the court to life imprisonment. A motion for new trial was filed on July 18, 1995, and the court reporter certified the trial transcript on July 22, 1995. On November 6, 1995, a hearing was held on the motion for new trial, and the motion was denied on November 14, 1995. A notice of appeal was timely filed with this Court on November 29, 1995, the appeal was docketed with this Court on January 8, 1996, and oral argument was held on March 19, 1996.

Once the victim was on the ground, Hawes continued to hit him with the baseball bat, sometimes swinging it as if it were a golf club, while his co-defendant simultaneously beat and kicked the victim. The victim tried to get up off of the ground, and tried to crawl away, but his assailants' blows made it impossible. The beating stopped only when the victim's sister laid herself on top of the victim in order to ward off Hawes' blows. When emergency medical workers arrived, the victim only showed faint vital signs. He died a short time later of blunt force trauma to the head.

Before going to the apartment complex, Hawes and his co-defendant were each seen taking an aluminum baseball bat with them. Hawes commented at that time, "I am going to go and kill me a nigger."[3] After the beating, while fleeing the apartment complex, Hawes was asked why he had hit the victim with a baseball bat. Hawes responded that he was "going to kill him a nigger."

1. Viewed most favorably to the verdict, the facts introduced into evidence could enable a rational trier of fact to find Hawes guilty of felony murder.[4]

2. Hawes claims that the trial court erred by denying his special demurrer seeking to strike his alias name, "Stomper," from the indictment. Hawes argues that he was prejudiced by inclusion of the alias in the indictment because the victim in this case quite literally was beaten and stomped to death.

It is established in Georgia that an indictment may allege that a criminal defendant is known by an alias.[5] Insofar as it is uncontroverted that Hawes was well known by the alias of "Stomper," there was nothing presumptively improper about the State indicting Hawes under both his legal and alias names.

Hawes has not come forward with evidence to establish that the State indicted him under his alias in order to prejudice him in the eyes of the jury by conjuring images of the murder in this particular case. If anything, the record indicates that the State's inclusion of "Stomper" in the indictment helped significantly to identify Hawes as the individual charged under the indictment. Several witnesses testified that they knew Hawes only by his alias of "Stomper," and Hawes himself testified that most people know him as "Stomper." To the extent that the gruesome connection between Hawes' crime and his alias might possibly have raised questions in the minds of the jury,

---

[3] The witness who recounted this statement also testified that she was unsure whether Hawes' comment was meant to be taken seriously.

[4] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[5] *Allen v. State*, 231 Ga. 17, 18 (200 SE2d 106) (1973), cert. denied, 414 U. S. 1159 (94 SC 919, 39 LE2d 112) (1974); *Andrews v. State*, 196 Ga. 84, 110-111 (26 SE2d 263) (1943); *Scott v. State*, 185 Ga. App. 887 (366 SE2d 196) (1988).

such questions were answered when Hawes testified under oath that he acquired the alias as a child, when he had a propensity to "run down the street stomping." Thus, the connection between the alias and the killing in this case appears to have been fortuitous, and we reject Hawes' first enumeration.

3. Hawes enumerates as error the trial court's admission into evidence of a contempt order issued against one of his witnesses, Ms. Howard, the young woman whom he accompanied when she went to retrieve her child just before Hawes fought with and killed the victim. Ms. Howard testified in the trial court that the victim had physically abused her on numerous occasions during their five-year relationship. Presumably, this testimony was intended to show the victim's propensity to behave violently, thereby justifying Hawes' actions.

On cross-examination, the State questioned Ms. Howard regarding an earlier magistrate's court proceeding concerning a criminal warrant she had sworn out against the victim, accusing him of battery. As was explained by Ms. Howard during her trial testimony, a hearing had been held in magistrate's court concerning the battery warrant. At the hearing in magistrate's court, Ms. Howard had admitted on the stand that she had sworn out the warrant because she had been angry with the victim, and that she had fabricated part of the factual allegations asserted in support of the warrant. The magistrate's court had issued an order holding Ms. Howard in criminal contempt for her abuse of the criminal justice system. At Hawes' trial, the State introduced a certified copy of that contempt order into evidence over Hawes' hearsay objection, for purposes of impeaching Ms. Howard's testimony.[6]

A witness's credibility may be impeached by evidence of conviction of a crime involving moral turpitude.[7] The concept of a crime involving moral turpitude, while nothing new, is not always susceptible to a clear and certain definition.[8] We have said that for purposes of witness impeachment, crimes involving moral turpitude are "restricted to the gravest offenses, constituting of felonies, infamous crimes, and those that are malum in se and disclose a depraved

---

[6] Hawes' hearsay objection, which he raises again on appeal, is meritless. It is based upon the argument that the truthfulness of the order's contents was improperly admitted without challenge, because the signing judge was not available for cross-examination. Certified copies of prior convictions are deemed sufficiently valid to be admitted into evidence. OCGA § 24-7-20.

[7] Hall v. Hall, 261 Ga. 188 (402 SE2d 726) (1991); Lewis v. State, 243 Ga. 443, 444 (254 SE2d 830) (1979).

[8] See Ramsey v. State, 145 Ga. App. 60, 62 (243 SE2d 555) (1978) (what constitutes moral turpitude is "at best amorphous"); McIntosh v. State, 443 S2d 1283, 1284 (Ala. 1983) (analyzing same definition of moral turpitude as used in Georgia); State v. Malusky, 230 NW 735, 737 (N.D. 1930) (same).

mind."[9] We have also indicated that moral turpitude is roughly the equivalent of infamy.[10] Likewise, the Court of Appeals has opined that a crime involving moral turpitude must be malum in se and not merely malum prohibitum, and involves " ' "an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow man, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." ' "[11] Also noteworthy is the Court of Appeals' recent holding that convictions for both criminal and civil contempt are neither felonies nor misdemeanors.[12]

Assuming without deciding that a criminal contempt citation based upon the false swearing out of a warrant is not a crime malum in se, and therefore does not involve moral turpitude for purposes of witness impeachment, we find that in this case, any error resulting from the admission into evidence of the contempt order was harmless. The record discloses that Ms. Howard admitted under cross-examination that she had lied in swearing out the warrant charging the victim with battery, and that she had been issued a contempt order by the magistrate's court for that misconduct. Hence, the evidence contained in the order was cumulative of other properly-admitted evidence, and therefore was harmless as a matter of law.[13]

4. Finally, Hawes claims that the trial court erred when, after correctly charging the jury regarding malice murder, voluntary manslaughter, and felony murder, it recharged the jury that it could reach a verdict on felony murder without having first disposed of the malice murder charge.

The record reveals that the trial court properly charged the jury as to malice murder and voluntary manslaughter (Count I) and felony murder (Count II). As part of its charge, the court instructed the jury that if it found provocation and passion (as previously had been defined) with respect to the killing, it could find Hawes guilty of voluntary manslaughter, but it could not find him guilty of felony murder. The jury then asked for reinstruction regarding whether it had to reach a unanimous verdict as to all counts. The court recharged the jury that there were three possible verdicts under Count I — guilty of malice murder, guilty of voluntary manslaughter, or not guilty — and if the jury found Hawes either guilty of malice murder or guilty of voluntary manslaughter, then it need not consider Count II, felony

---

[9] *Hall,* supra.

[10] Id.

[11] *Ramsey,* supra (citations omitted).

[12] *Flanagan v. State,* 212 Ga. App. 468, 469 (442 SE2d 16) (1994).

[13] *McLendon v. State,* 259 Ga. 778, 780 (387 SE2d 133) (1990); *Maher v. State,* 216 Ga. App. 666, 667 (455 SE2d 377) (1995).

murder.

After two hours of deliberation, the jury asked whether it could deadlock as to Count I and still reach a verdict as to Count II, or whether that would result in a mistrial. Upon questioning the foreperson, the court learned that the jury believed itself to be deadlocked as to one of the counts of the indictment, but that it had not yet reached a verdict as to the other count.

After conferring with counsel, the trial court recharged the jury by reminding it of the possible verdicts on Count I that previously had been explained to it. The court instructed the jury that it was to continue deliberating with an eye toward a unanimous verdict as to each count, and that it was not to consider whether a mistrial might be declared as a result of its decisions. Then a juror asked whether Count I had to be disposed of before Count II could be considered, or, if the jury deadlocked on one count, was it free to go on to consider the other count. The juror also asked for a recharge on the definition of malice. After again conferring with counsel, the court recharged properly on malice, and instructed the jury that it "need not dispose of Count I before you go on to consider Count II. It does not matter what order your decisions are made, *as long as they are made consistently with the instructions that I have given you.*" The court again cautioned the jury that it was not to consider what might happen if it failed to reach a unanimous verdict on any count. The jury then returned a verdict of deadlocked on Count I, and guilty on Count II.

On appeal, Hawes argues that the recharge instructing the jury that it need not dispose of Count I before considering Count II was inconsistent with the original charge, and prevented the jury from fully considering whether Hawes was guilty of voluntary manslaughter before going on to consider whether he was guilty of felony murder. Hawes argues that the trial court should have recharged the jury that it had to reach verdicts on Count I before proceeding to Count II, and that the jury then would have found him guilty only of voluntary manslaughter.

In *Edge v. State,* we disapproved of sequential charges that instruct juries to consider voluntary manslaughter only after considering and finding a defendant not guilty of malice murder and felony murder, because to do so eliminates the jury's full consideration of the voluntary manslaughter charge in cases where it concludes that a felony murder occurred.[14] We instructed that courts should instruct juries so as to ensure adequate consideration of charges for both mur-

---

[14] 261 Ga. at 867.

der and manslaughter.[15] Specifically, we instructed that a jury should be charged that if it finds provocation and passion with respect to the killing, it cannot find felony murder, but may find voluntary manslaughter.[16]

In this case, the trial court charged the jury expressly that if it found provocation and passion with respect to the killing, it could not find felony murder but could find voluntary manslaughter. This was entirely consistent with *Edge* and case law interpreting that opinion.[17] When it recharged the jury that it could consider Count II, charging felony murder, before disposing of Count I, charging malice murder and voluntary manslaughter, the trial court (1) reasonably believed the jury was deadlocked on Count I, and (2) expressly stated that the jury's consideration of the felony murder charge had to be consistent with the court's other instructions. Necessarily, this included the court's earlier instruction that the jury could not find Hawes guilty of felony murder if it believed the killing was mitigated by provocation and passion. We believe that jurors of ordinary capacity and understanding, hearing the trial court's recharge and its reference to the earlier instructions, would have understood this and deliberated accordingly.[18] Thus, we find that there was no error when the trial court, finding the jury deadlocked as to Count I, recharged the jury that it could go on to consider Count II, so long as it did so in a manner consistent with the court's other instructions — which included the instruction that if the jury found provocation and passion, then it could not find felony murder.[19]

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 28, 1996.

*Janet S. Willy*, for appellant.

*Harry N. Gordon*, District Attorney, *Gerald W. Brown*, Assistant District Attorney, *Michael J. Bowers*, Attorney General, *Wesley S. Horney*, Assistant Attorney General, for appellee.

---

[15] Id.

[16] Id., n. 2.

[17] See id.; *Jones v. State*, 265 Ga. 203, 205 (455 SE2d 34) (1995).

[18] See *Ayers v. State*, 214 Ga. 156, 163 (103 SE2d 574) (1958).

[19] While we are satisfied that *Edge* was complied with in this case, in order to ensure such compliance in future cases, trial courts would do well, when recharging a jury deadlocked as to a count charging malice murder that they may go on to consider a count charging felony murder, to repeat an instruction that the jury cannot find felony murder if it finds the existence of provocation and passion.