In the Supreme Court of Georgia

Decided:   July 5, 2016

S16A0066. GREEN v. THE STATE.

HINES, Presiding Justice.

Steven James Green appeals from the denial of his amended motion for new trial following his convictions for malice murder, burglary, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon in connection with the fatal shooting of Anthony Shane Augustus and the aggravated assault of Shyrome Marshall, as well as the burglary of Marshall's home.  For the reasons that follow, we affirm.

This is the second appearance of this case in this Court.  In *Green v. State*, 295 Ga. 108 (757 SE2d 856) (2014), we found the evidence against Green to be sufficient to enable a rational trier of fact to find Green guilty beyond a reasonable doubt of all of the crimes of which he was convicted, and rejected Green's claim that a new trial was warranted because a juror was not impartial;

we also remanded the case to the trial court to consider Green's claim that trial counsel had been ineffective, which claim could not have been practically raised at an earlier time. Id. at 112 (3). Upon remand, the trial court conducted a hearing to address Green's claims of ineffective assistance of trial counsel, and denied Green's amended motion for new trial based thereon.

As noted in our prior decision, evidence presented at trial showed that: Marshall, accompanied by his friend Augustus, returned to his apartment one evening to find that the front door had been forced open; Marshall entered the apartment and Green struck him 15 or 16 times with a pistol; Green placed the pistol to Marshall's head and directed Marshall to give him money; Augustus distracted Green; Marshall ran to a nearby apartment; Augustus was fatally shot; and Green and another man ran from Marshall's apartment. Id. at 109.

1. In this appeal, all of Green's enumerations of error relate to the trial court's denial of his amended motion for new trial based on the alleged ineffective assistance of trial counsel. Generally, in order to prevail on a claim of ineffective assistance of counsel, Green must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985),

citing *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. Id. at 784. To meet the second prong of the test, he must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. Id. at 783. "'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

a) In its case-in-chief, the State presented the testimony of Rachael Anderson, who was Green's girlfriend at the time of the crimes. Before her testimony, the State informed the court that another witness, John Manning, had voluntarily come to trial that day, but had left, and that Manning had since been located, had been served with a subpoena, and would be in court at 8:30 the next

3

morning. The State further declared that it anticipated that Manning would impeach Anderson's testimony, and that it would ask Anderson questions, the answers to which Manning would presumably impeach in the morning. And, during its examination of Anderson, the State asked her several questions regarding whether she had told Manning that Green had told her certain details of the events in Marshall's home, including whether she "recall[ed] telling John Manning that Green shot one of the guys?" Anderson consistently answered these questions to the effect that she had no recollection of any conversation with Manning about Green's case, did not have the type of relationship with Manning that would have provided a basis for a discussion of the case, and had he brought the subject up, she would have informed him that she did not wish to discuss it. On cross-examination, she testified that as best she could recall, she had met Manning when she worked at a bar or nightclub, "he developed some kind of obsession with me and a friendship with [Green] of some kind," and that he had "tried very hard several times" to date her.

Manning was never called to testify,[1] and Green contends that it was

---

[1] Green made no attempt to show that the State's failure to produce Manning's testimony was done in bad faith.

ineffective assistance for counsel to fail to move the court to declare a mistrial, or to strike the questions and answers regarding Manning from the record based upon that failure. However, Green fails to show prejudice arising from the failure.

> When prejudicial matter is improperly placed before the jury, a mistrial is appropriate if it is essential to the preservation of the defendant's right to a fair trial. Whether the statements are so prejudicial as to warrant a mistrial is within the trial court's discretion.

*Wilkins v. State*, 291 Ga. 483, 486 (4) (731 SE2d 346) (2012) (Citations omitted.) And, the trial court properly instructed the jury that questions by the attorneys were not evidence, Anderson's responses to the State's questions did not agree that the premises of the questions were true, and therefore they were not evidence that the premises of the questions had any basis in fact. In such circumstances, there is no reasonable probability that striking the questions and answers, or giving a further instruction to the jury that the State's questions were not evidence, would have produced different verdicts. *Jones v. State*, 290 Ga. 576, 580 (4) (722 SE2d 853) (2012). Nor is it reasonably probable that the trial court would have declared a mistrial rather than give a curative instruction, as a mistrial would not have been essential to preserve Green's right to a fair trial.

Id.

b) After the testimony of State's witness Marshall, the jury was excused and, while Marshall was still on the witness stand, the court questioned the veracity of Marshall's testimony that he was not a drug dealer; after questioning Marshall itself, the court found him in criminal contempt of court for not testifying truthfully, and ordered that he serve 20 days in jail for the contempt. After two other witnesses testified, trial counsel asked the court whether the court's finding of criminal contempt could be used to impeach Marshall's testimony; the court responded that it would not be appropriate to inform the jury that the court had concluded that a witness had lied in his testimony, and that to do so would potentially interfere with the jury's independent determination of Marshall's credibility.

Green asserts trial counsel was ineffective when he failed to object to the court's ruling and therefore preserve appellate review of this issue, contending that impeachment of Marshall by the contempt finding would have been appropriate. At the time of Green's 2012 trial, the impeachment of a witness

6

was governed by former OCGA § 24-9-84.1 (a),[2] and Green contends that, as former OCGA § 24-9-84.1 (a) (3) states that a witness can be impeached by evidence that he "has been convicted of a crime . . . if it involved dishonesty or making a false statement," a witness can thus properly be impeached with a finding that the witness had been held in criminal contempt for falsely testifying. The State, however, notes that in *Hawes v. State*, 266 Ga. 731, 734 (3) (470 SE2d 664) (1996), this Court observed that the Court of Appeals had then recently held "that convictions for both criminal and civil contempt are neither felonies nor misdemeanors," citing *Flanagan v. State*, 212 Ga. App. 468, 469 (1) (442 SE2d 16) (1994), and the State asserts that criminal contempt thus cannot

---

[2] Former OCGA § 24–9–84.1 read, in relevant part:

(a) *General rule.* For the purpose of attacking the credibility of a witness, or of the defendant, if the defendant testifies:

> (1) Evidence that a witness has been convicted of a crime shall be admitted if the crime was punishable by death or imprisonment of one year or more under the law under which the witness was convicted if the court determines that the probative value of admitting the evidence outweighs its prejudicial effect to the witness;
> (2) Evidence that the defendant has been convicted of a crime shall be admitted if the crime was punishable by death or imprisonment of one year or more under the law under which the defendant was convicted if the court determines that the probative value of admitting the evidence substantially outweighs its prejudicial effect to the defendant; and
> (3) Evidence that any witness or the defendant has been convicted of a crime shall be admitted if it involved dishonesty or making a false statement, regardless of the punishment that could be imposed for such offense.

7

serve as a basis for impeachment under former OCGA § 24-9-84.1 (a) (3). However, in doing so, the State ignores the fact that, in *Hawes*, this Court specifically "[a]ssum[ed] without deciding that a criminal contempt citation based upon the false swearing out of a warrant is not a crime malum in se, and therefore does not involve moral turpitude for purposes of witness impeachment," supra, and consequently *Hawes* does not stand for the proposition that a finding of criminal contempt cannot serve as a basis for impeachment under former OCGA § 24-9-84.1 (a) (3). But, just as determining whether the contempt finding in *Hawes* could serve as a basis for impeachment under that statute was not necessary to a resolution of the issue presented in that case, so too is such a determination unnecessary here.

The trial court was correct to be concerned that its finding that Marshall was in criminal contempt could invade the jury's role. Indeed, as this Court has observed,

> OCGA § 17–8–57 says that "[i]t is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused . . . ." One of the purposes of OCGA § 17–8–57 "is to prevent the jury from being influenced by any disclosure of the trial court's opinion regarding the credibility of a witness." [Cit.]

8

*Smith v. State*, 297 Ga. 268, 270 (2) (773 SE2d 269)( 2015).  For the trial court to allow the jury to be informed that it had found Marshall to have testified falsely would have directly violated this principle.  Indeed, it has been observed that if the trial court wishes to inquire into the behavior of a witness, "the recommended practice is to remove the jury from the courtroom before the trial court holds a witness or party in contempt or otherwise comments on the conduct of a person before the court," *Roberts v. State*, 208 Ga. App. 628, 629 (1) (431 SE2d 434) (1993), and such precaution would have no value if, as Green proposes, the jury could then be informed that the court has held a witness in contempt for testifying falsely.

The trial court did not err in informing trial counsel that he could not impeach Marshall's testimony by informing the jury that the court had found Marshall in contempt for falsely testifying, and thus it was not ineffective assistance to fail to make any objection on this ground.  *Nations v. State*, 290 Ga. 39, 44 (4) (d) (717 SE2d 634) (2011).

2. Green also contends that trial counsel was ineffective by virtue of a conflict of interest in that, at the time of trial, counsel not only represented Green, but also represented Anderson, who was facing felony drug charges

arising from the search of her car after law enforcement investigators who were questioning her about Green's use of her car, and his whereabouts on the night Augustus was killed, came to believe that Anderson had illegal drugs in her car; it is uncontroverted that the found drugs were not Green's and were not connected to any actions on his part that underlay the State's prosecution of Green.

Green first notes that, although counsel's potential conflict of interest was called to the trial court's attention, and the trial court made extensive inquiry of Green about the matter, Green's declarations that he wanted counsel to represent him despite any potential conflict of interest on counsel's part were merely verbal, and thus, assuming that any informed consent to the continued representation was permissible under the Rules of Professional Conduct, Green's consent to continued representation by counsel did not comply with Rule 1.7 of those Rules.[3] Although Green urges that the asserted violation of

[3] Rule 1.7 states:

(a) A lawyer shall not represent or continue to represent a client if there is a significant risk that the lawyer's own interests or the lawyer's duties to another client, a former client, or a third person will materially and adversely affect the representation of the client, except as permitted in (b).

(b) If client informed consent is permissible a lawyer may represent a client notwithstanding a significant risk of material and adverse effect if each affected client or former client gives informed

Rule 1.7 establishes ineffective assistance of counsel, as this Court has noted, "[a]n ethics violation, however, does not necessarily establish a claim of ineffectiveness of counsel." *Blackshear v. State*, 274 Ga. 842, 843 (2) (560 SE2d 688) (2002). While we take this opportunity to emphasize that compliance with the Rules of Professional Conduct should always be maintained, attorney discipline for a violation of those Rules is not before us, but only the issue of whether Green has established ineffective assistance of trial counsel in regard to counsel's simultaneous representation of him and Anderson.

In order

[t]o prevail on a claim that a conflict of interest worked a denial of

---

consent confirmed in writing to the representation after:

(1) consultation with the lawyer pursuant to Rule 1.0(c);
(2) having received in writing reasonable and adequate information about the material risks of and reasonable available alternatives to the representation; and
(3) having been given the opportunity to consult with independent counsel.

(c) Client informed consent is not permissible if the representation:

(1) is prohibited by law or these Rules;
(2) includes the assertion of a claim by one client against another client represented by the lawyer in the same or a substantially related proceeding; or
(3) involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients. The maximum penalty for a violation of this Rule is disbarment.

the effective assistance of counsel, a defendant like [Green]—one who failed to object to the conflict at trial—must show that "an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (IV) (B) (100 SCt 1708, 64 LE2d 333) (1980) (footnote omitted). See also *Barrett v. State*, 292 Ga. 160 (174) (3) (C) (2) (733 SE2d 304) (2012). As we consider whether [Green] has made such a showing, we do not, however, inquire "into actual conflict as something separate and apart from adverse effect." *Mickens v. Taylor*, 535 U.S. 162, 172 (II) n. 5 (122 SCt 1237, 152 LE2d 291) (2002). Rather, as the United States Supreme Court has explained, an "actual conflict of interest" means "a conflict *that affected counsel's performance* — as opposed to a mere theoretical division of loyalties." Id. at 171(II) (emphasis in original). See also *Tolbert v. State*, 298 Ga. 147, 149 (2) (a) (780 SE2d 298) (2015). [Green] "first asserted a conflict of interest on the part of his trial lawyer in a motion for new trial, and on that motion, he had the burden of proving that his trial lawyer had an actual conflict of interest, that is, one that significantly and adversely affected the adequacy of the representation." Id. at 150 (2) (a).

*White v. State*, 298 Ga. 416, 418 (2) (782 SE2d 280) (2016).

Green contends that he established that counsel had a conflict of interest that significantly and adversely affected his representation by demonstrating that counsel did not impeach Anderson's testimony by showing that she was under prosecution at the time of trial, or by use of her prior video recorded interview with law enforcement investigators. But, counsel testified at the hearing on the amended motion for new trial that he chose not to call Anderson as a defense

12

witness[4] because he did not want to rely upon her statements to attempt to establish that Green was at the home Anderson shared with Green during the period of time Augustus was killed as cell phone data showed that he was not at their home, and details of that cell phone data as to time and locations allowed counsel to argue that Green could not have been at the crime scene when Augustus was killed.[5]   Similarly, counsel testified that cross-examining Anderson regarding her prior statement to investigators would be of no help to Green.[6]  Accordingly, Green has failed to establish that counsel's decision not to impeach Anderson "was the result of a conflict of interest, as opposed to a reasonable strategic decision."  Id. at 419 (Punctuation and citation omitted.)

---

[4] Counsel also stated this at the beginning of the trial, when his representation of Anderson was first raised to the court.

[5] During closing argument, counsel reviewed with the jury not only the cell phone data, but video surveillance evidence from a grocery store, to support his argument that Green could not have been at the crime scene between 9:45 p.m. and 10:05 p.m., the time frame in which law enforcement investigators had determined the crimes occurred.

[6] The State notes that any conflict between Anderson's trial testimony and the uncertain information she gave investigators is at most minor.  At trial, Anderson testified that, as to the 9:15 p.m. to 10:15 p.m. time period about which she was asked, she could not "remember between the exact minute," but that Green would have been home "nearing that ending time" because she and Green would have "had a really big fight . . . if he hadn't have been home early."  Anderson told the investigators that she had been home all the day and evening that the crimes were committed, that Green was home in the afternoon, until 5:00 p.m. or 6:00 p.m. – although she could not "guarantee" that time – and left for two or three hours, with a "maximum" of three hours.  When questioned further, she stated that Green "had to have been home" by about 10:00 p.m.; she also admitted that she, in fact, had left their home around 4:00 p.m. or 5:00 p.m., gone to a café, and saw Green there.

Simply put, regardless of who represented Anderson, Green's trial counsel would not want to introduce her interview with law enforcement investigators, through impeachment or otherwise, and Green fails to establish that counsel "would have acted differently absent the alleged conflict of interest. [Cit.]" *Barrett v. State*, 292 Ga. 160, 174-175 (3) (C) (2) (733 SE2d 304) (2012).[7]

Judgments affirmed. All the Justices concur.

---

[7] Although during the hearing on the amended motion for new trial, Green did not develop testimony about counsel's decision not to impeach Anderson with the fact of her drug prosecution to the same degree as he did regarding counsel's choice not to impeach her with her interview with investigators, counsel's decision would have been based upon the same consideration; as Anderson's testimony did not particularly aid or harm Green's defense, it would not aid Green to impeach it by showing that Anderson was under prosecution for drug crimes.