309 Ga. 295
FINAL COPY

S20A0270. STRONG v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Aaron Strong was convicted of felony murder, aggravated assault, and knife-possession offenses based on the fatal stabbing of his wife's son, Maurice Arnold, and the stabbing of her grandson, Deandre Arnold. At his trial, Appellant claimed that he acted in self-defense. His main contention on appeal is that the trial court abused its discretion when it admitted under OCGA § 24-4-404 (b) voluminous evidence of multiple other acts of violence that he allegedly committed. As we explain below, the trial court did abuse its discretion by admitting that evidence, and because those evidentiary errors were not harmless, we reverse Appellant's convictions.[1]

---

[1] The stabbings occurred on August 25, 2015. On June 8, 2017, a Cobb County grand jury indicted Appellant for the malice murder of Maurice Arnold, felony murder based on aggravated assault with an object likely to result in serious bodily injury, one count each of aggravated assault with an object likely

1. *The evidence presented at trial.*

The evidence presented at Appellant's trial showed the following.[2] On August 25, 2015, Appellant and his wife, Felicie Strong, returned to their home in Cobb County after a three-day trip to Florida. Appellant and Felicie shared their home with Felicie's 32-year-old son Maurice and 22-year-old grandson Deandre. Appellant went to his friend's house for a few hours, where he had two alcoholic drinks. He came home as it was getting dark and began to argue in the kitchen with Maurice and Deandre because they had

to result in serious bodily injury against Maurice and Deandre Arnold, aggravated battery of Deandre by seriously disfiguring his body, and two counts of possession of a knife during the commission of a felony. Appellant was tried from August 21 to 28, 2017. The jury found him not guilty of malice murder and aggravated battery, but guilty of the other charges. The trial court sentenced Appellant to serve life in prison without the possibility of parole for felony murder, twenty concurrent years for the aggravated assault of Deandre, and five consecutive years for each knife possession charge. The court merged the count for aggravated assault of Maurice into the felony murder conviction. Appellant filed a timely motion for new trial, which he later amended with new counsel. On March 5, 2019, after a hearing, the trial court denied the motion. On June 4, 2019, Appellant filed a motion for an out-of-time appeal, which was granted on June 6. Appellant then filed a notice of appeal on June 19, and the case was docketed to the term of this Court beginning in December 2019.

[2] Because this case requires a close assessment of whether evidentiary errors by the trial court were harmless, we lay out the evidence in considerable detail and not only in the light most favorable to the jury's verdicts. See *Heard v. State,* ___ Ga. ___, ___ n.2 (___ SE2d ___) (2020).

not washed the dirty dishes while Appellant and Felicie were gone. Appellant had a troubled relationship with Maurice and Deandre. Although sometimes they got along, there also were frequent arguments due to Appellant's dissatisfaction with the men's failure to get jobs or help around the house and their continued reliance on Felicie. According to Felicie, Appellant's annoyance with Maurice and Deandre was heightened when he had been drinking.

The argument between Appellant and Maurice and Deandre escalated. Aaron Day, a neighbor who was a friend of Maurice, had been playing video games online with Maurice when the argument started. He heard yelling over the video-game communication channel and became concerned by how heated it sounded, so he walked down to Maurice's house to defuse the situation. Deandre went to his room, and Appellant followed him and "busted the door open." Deandre then stayed in his room, while Appellant returned to the living room and continued to argue with Maurice. Felicie came into the living room, said, "I'm not dealing with this tonight," and left the house. She drove to a nearby parking lot and sat in her car

reading a book. Day suggested that Maurice join him outside to smoke a cigarette. Deandre and then Appellant also went outside.

Day, Maurice, and Deandre decided that they should go to Day's house to let Appellant calm down. Maurice and Deandre went back inside the house to get some of their things. Day stayed outside in the yard, holding Maurice's dog on a leash. Appellant stayed on the front porch. A few minutes later, Maurice came back out of the house. As Maurice walked by Appellant, Appellant shoved him into a corner of the porch and began stabbing him with a large hunting knife. Maurice yelled, "Help, help, he's stabbing me!" Deandre rushed outside, and when he came up behind Appellant and tried to stop the attack on Maurice, Appellant began stabbing Deandre. Deandre was able to force Appellant to the ground and escape off the porch. Deandre testified that he had a pocketknife in his pocket, but he was not able to reach it during the fight; Day testified that Maurice and Deandre were unarmed.

Maurice, who could not move, and Appellant remained on the

porch while Day called 911.[3] At some point, Day approached the porch and turned on his cell phone's flashlight so he could see Maurice. He saw Appellant turn on his own cell phone's flashlight and walk toward the hunting knife, which was still on the porch. Day then backed away. Deandre called Felicie and told her that Appellant was stabbing Maurice; she returned home quickly. When she walked up to the porch, Appellant moved toward her and pointed the knife at her, saying, "This is your fault."[4] She then walked away from the porch.[5]

---

[3] The recording of Day's 911 call was played for the jury. Day first told the 911 operator that he did not know who stabbed the victims. Then he said it was a "resident of the house." Day testified that he did not give Appellant's name because he was afraid of how Appellant would react.

[4] According to Felicie, Appellant also said, "This is what you wanted," and according to Day, Appellant also said, "See what you made me do?"

[5] The foregoing account of the argument and physical fight is based on the trial testimony of Felicie, Day, and Deandre, who gave accounts that were generally consistent with each other. Detective Michael Hill, the police officer who had interviewed these three witnesses after the incident, also testified, and his testimony revealed a few changes in Day's and Deandre's stories. Detective Hill testified that in his interview, Day said that he was not sure whether Appellant or Maurice shoved first when Maurice came onto the porch, and Detective Hill acknowledged that he testified at the probable cause hearing in this case that Day said that Maurice shoved Appellant first. Also, although Day testified that Appellant kicked in Deandre's bedroom door, he did not mention that fact in his interview. (Deandre also testified that his door had been kicked in, but in his account, Day had not yet arrived at the house

When police officers arrived at the house, Appellant seemed calm and submitted to arrest. He showed the officers where the hunting knife was. He said that "someone" had tried to kill him, but he did not have any visible injuries. One of the officers testified that Appellant smelled strongly of alcohol, and the officer who documented the scene after Appellant had been removed testified that the porch smelled strongly of alcohol. Maurice and Deandre were taken to the hospital. Maurice, who had eight wounds caused by stabbing or cutting, including a deep stab wound that lacerated his liver and lung, died in the ambulance. The medical examiner testified that three of Maurice's wounds were minor, and three of them, including the wound to his liver and lung, indicated that the knife went into and out of each wound twice. On cross-examination,

when that happened.) When Deandre was interviewed from his hospital bed while recovering from surgery, he said that a woman named Taylor, whom he had just met, had been at the house for the duration of the fight and that Day walked Taylor to her car after the stabbing. Day did not say anything about Taylor. The police were not able to find Taylor, and at trial Deandre testified that he did not recall telling the police anything about Taylor but he knew "Taylor was around there." One of Deandre's treating physicians testified that Deandre was given drugs to deal with pain before and after surgery that can affect short-term memory and may take weeks to wear off completely.

the medical examiner acknowledged that this type of double wound could have resulted from the body moving around the knife, rather than the knife being moved in and out again. He also testified that he could not determine from the wounds who the first aggressor was. Deandre, who had been stabbed six to seven times, resulting in wounds to his left chest, shoulder, and arm, remained in the hospital for a week, but ultimately recovered from his wounds.

As detailed in Division 2 (c) below, the State also presented extensive evidence —— through seven witnesses and comprising about one-fourth of the transcript of the State's case —— about nine other violent acts allegedly committed by Appellant, which the trial court admitted under OCGA § 24-4-404 (b) ("Rule 404 (b)"). This evidence included six alleged assaults and threats against Appellant's former domestic partner Connie Evans between 1991 and 1997; an alleged shooting of Anthony Fortson in his back as he fled down a street in 1994, which resulted in his hospitalization for a month; an alleged assault of Appellant's then-wife Gracie Brown Strong in 2001, which broke her neck and left her permanently

paralyzed; and an alleged beating of Appellant's employee Ashanti Magee in 2012. The State did not present any evidence that Appellant had been charged with or convicted of any crimes related to these incidents.

Testifying in his own defense, Appellant claimed that he stabbed Maurice and Deandre in self-defense. He gave the following account. When Appellant returned from his friend's house, Felicie was sitting in the kitchen looking sad. He asked her what was wrong, but she did not answer him. Instead, she walked out of the house and drove away. After she left, he asked Maurice and Deandre what was bothering her, and Maurice said, "None of your damn business." This led to an argument, in which Appellant asked why they had not cleaned up the kitchen. As the argument escalated, Appellant saw a kitchen knife out on the table and decided that he should not continue to argue with Maurice and Deandre in the kitchen, where he was outnumbered. Appellant went to his bedroom. He put the knife that he kept in his bedside table in his pocket, lay down on his bed, and began to fall asleep. Less than ten minutes

later, someone kicked in his bedroom door and then ran to the front door.

Appellant went to the porch, where he saw Maurice, Deandre, and Day talking. Appellant walked in front of Maurice and asked if one of them had kicked in his door. In response, Maurice hit Appellant and Deandre began moving closer. Day got off the porch at some point. Appellant's glasses were knocked off his face, and he saw a round object, which he believed to be a bat, in Maurice's hand.[6] Appellant grabbed Maurice's arm and Deandre came from behind Appellant, wrapping his arm around Appellant's neck. Appellant pulled out his knife and began stabbing Maurice and Deandre. Appellant eventually hit Maurice, who fell down. Appellant then slipped in blood and landed on his back. Deandre fell on top of him and began throwing ineffectual punches. Appellant told Deandre to get off him so he could help Maurice, but Deandre refused, saying, "I been wanting to do this." Deandre walked off the porch when Day

---

[6] A pair of glasses and a beer bottle were found on the porch, but no bat was found in the area.

said the police were coming. As he walked off, Deandre said, "I hope they shoot your MF ass." Appellant then tried to call one of his daughters. He did not call 911 because he knew Day had already called.[7]

Appellant, who was 67 years old at the time but in good physical condition, explained that although he was not afraid of Maurice or Deandre by themselves, he was afraid of the two of them taking him on together.[8] Appellant testified that in 2010, Maurice and Appellant got into an argument, and Maurice got his gun, "put it in [Appellant's] face," and said, "You don't know what you're getting into." Maurice then pulled the trigger, but the gun jammed. Deandre testified that he had heard about the fight where Maurice pulled a gun on Appellant. Felicie testified that Appellant had body-slammed Maurice before Maurice got his gun and brandished it at

---

[7] According to Appellant, although he had consumed some alcohol, he was not drunk, but Maurice was, and Maurice threw up on him, which was the likely cause for the alcohol smell on him and the porch. Appellant had vomit on his shirt when he was arrested, and Maurice's blood had an alcohol content of 0.07 at the time of his autopsy.

[8] Appellant is 5 feet, 5 inches tall and weighed 250 pounds. Maurice was 5 feet, 6 inches tall and weighed 140 pounds. There was no evidence about Deandre's size, other than what the jury could observe when he testified.

Appellant; she was told later that Maurice had pulled the trigger. Maurice was arrested and put on probation for this offense. Appellant also testified that in 2014, after Felicie said she would not buy Maurice a new laptop, Maurice said to Felicie, "That's why I'm going to kill you and him." Appellant reported this threat to the police the next day, but he said that he did so only to create a record; he was not afraid. Felicie testified that Maurice threatened her and Appellant's lives after a fight about a computer. Deandre testified that Maurice had a short temper, and Deandre said in his interview with Detective Hill, see footnote 5 above, that Maurice liked to "punch things when he g[ot] mad" and was known for starting fights with the police.

As discussed in Division 2 (c) below, Appellant also testified extensively on both direct and cross-examination about the many other alleged but uncharged acts of violence that the State had presented during its case. His testimony about the evidence admitted under Rule 404 (b) constituted almost a third of his time on the witness stand, including over 40% of the State's cross-

examination of him.

Appellant also called an expert in forensic pathology, who testified that the victims' wounds were consistent with Appellant's account of the stabbings, although the expert acknowledged that the wounds could be consistent with a number of other accounts as well. Appellant's counsel argued in closing that Day and Deandre had conspired to give a false account of the incident.

Appellant does not dispute the legal sufficiency of the evidence supporting his convictions.[9] Nevertheless, as is this Court's customary practice in murder cases, we have reviewed the record and conclude that — when viewed in the light most favorable to the verdicts — the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of felony murder. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt

---

[9] Appellant does briefly argue that because he was acquitted of the malice murder charge, convicting him of felony murder was a violation of the double jeopardy provisions of the United States and Georgia Constitutions. That argument is meritless. See *Dugger v. State*, 297 Ga. 120, 122 (772 SE2d 695) (2015); *Manzano v. State*, 290 Ga. 892, 893 n.2 (725 SE2d 326) (2012).

2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. *The other acts evidence was improperly admitted under Rule 404 (b).*

Appellant argues that the trial court abused its discretion in admitting the evidence of his other violent acts under Rule 404 (b). We agree.

(a) *Rule 404 (b).*

Under OCGA § 24-4-404 (b), "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith[,]" but such other acts evidence is admissible for other purposes, including to prove intent, motive, and absence of mistake or accident. The party offering evidence under Rule 404 (b) must show three things: (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is

not substantially outweighed by its undue prejudice; and (3) that there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act. See *Kirby v. State*, 304 Ga. 472, 481 (819 SE2d 468) (2018).

To determine whether, under the first part of this test, the evidence offered is relevant to a particular non-character purpose, we look to OCGA § 24-4-401 ("Rule 401"), which defines "relevant evidence" as evidence that "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." This is a binary question – evidence is either relevant or it is not. See *Olds v. State*, 299 Ga. 65, 69-70 (786 SE2d 633) (2016).

The second part of the test is governed by OCGA § 24-4-403 ("Rule 403"), which says:

> Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Rule 403 "is designed to exclude matter of scant or cumulative

probative force, dragged in by the heels for the sake of its prejudicial effect." *McKinney v. State*, 307 Ga. 129, 137 (834 SE2d 741) (2019) (citation and punctuation omitted).

The third part of the test is a preliminary question of fact for the trial court. "[O]ther acts evidence may be admitted if the court concludes that the evidence is sufficient for the jury to find by a preponderance of the evidence that the other act was committed." *Bradshaw v. State*, 296 Ga. 650, 656 n.4 (769 SE2d 892) (2015). See also OCGA § 24-1-104 (b) ("When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.").

We review the trial court's ruling admitting evidence under Rule 404 (b) for abuse of discretion. See *Kirby*, 304 Ga. at 479.

(b) *The trial court's admission of the other acts evidence under Rule 404 (b).*

At a pretrial hearing, the State asked the trial court to admit under Rule 404 (b) proffered evidence of a dozen other violent acts

allegedly committed by Appellant over the 40 years before the August 2015 stabbings charged in this case. The State argued that the prior incidents rebutted Appellant's claim of self-defense by showing that his "motive is to control other people," that "whenever a person doesn't submit to his control, he reacts with violence," and that "his intent is to harm." Appellant objected, arguing that the other acts were not relevant and that they did not pass the second part of the Rule 404 (b) test. The trial court ruled that ten of the other acts were admissible for the purposes of proving Appellant's "motive, intent, and absence of mistake or accident and to rebut justification."[10]

During the trial, before calling its first witness to testify about the other acts, the State asserted outside the presence of the jury

---

[10] The trial court ruled that one act (a simple assault against an unrelated victim in 1999) was inadmissible because the State had not shown the relevance of Appellant's motive and intent in committing this act, and the court withheld ruling on one act, a murder that Appellant committed in 1973. There was more discussion about the 1973 murder outside the presence of the jury at trial, but the court never made a definitive ruling on the admissibility of the murder evidence and no evidence of that crime was introduced at trial.

that Appellant had raised the issue of Maurice's violent character in Appellant's opening statement and through cross-examination of Felicie, Deandre, and other witnesses.[11] The State argued that all of the other acts evidence was therefore also admissible as evidence of Appellant's violent character under OCGA § 24-4-404 (a) ("Rule 404 (a)"), so the evidence did not require an instruction limiting the jury's consideration of the evidence to Rule 404 (b) purposes.[12] The trial court said that it was inclined to keep the evidence limited to Rule 404 (b), but that it would consider the issue further.

Although the trial court never made an express ruling on the Rule 404 (a) issue, it implicitly rejected the State's character evidence argument because it gave a Rule 404 (b) limiting instruction before the other acts evidence was presented (and gave

---

[11] In his opening statement, Appellant's counsel referred to the 2010 gun-pointing incident and the 2014 death threat discussed in Division 1 above. Before the other acts evidence was presented, Felicie testified about both incidents, Deandre testified about the 2014 incident, and Detective Hill testified that Deandre said that Maurice liked to "punch things" and was known for starting fights with the police.

[12] As discussed in Division 3 below, the Attorney General (but not the District Attorney) makes a similar Rule 404 (a) argument on appeal, which we reject.

a similar instruction again as part of the final jury charge):

> [S]ometimes evidence is admitted for limited purposes. Now, in order to prove the case in this case the State must show intent, they must negate or disprove mistake or accident or justification, and may show motive as well. To do so the State intends to offer into evidence other wrongs and/or acts committed by the accused. Now, . . . you will be permitted to consider that evidence but only insofar as it relates to those issues of intent, or showing intent, or disproving mistake, accident, justification, and showing motive, and you may not consider it for any other purpose.
>
> You may not infer from that evidence that the defendant is of a character that he would commit such crimes. The evidence may be considered by you only to the extent that it shows the issues that the State is required to prove in the crimes charged in this case now on trial, and such evidence may not be considered for any other purpose. The defendant is on trial for the offenses alleged in this indictment only, and is not on trial for any other acts.
>
> Now, before you may consider any of these other alleged acts for that limited purpose which I've stated you must determine whether or not it is more likely than not that the accused committed these other acts, and if so, then you must determine whether the acts shed any light on the issues for which . . . the act was admitted in the crime charged in this indictment in this trial. And keep in mind the limited use and the prohibited use of the evidence about other acts.

Appellant objected again to the admission of all of the other acts evidence under Rule 404 (b), and the court again overruled his

objection. The State then presented to the jury evidence of nine of the ten acts that had been ruled admissible, and Appellant later testified about the incidents on both direct and cross-examination; we will summarize that evidence in a moment. Both Appellant's counsel and the prosecutor devoted considerable time in their closing arguments to discussing the other acts. Appellant's counsel emphasized how far removed in time the incidents were and focused on the unreliability of the witnesses. The prosecutor argued that Appellant's other violent acts showed that he was "a controlling person" who said in every situation that it was "never ever his fault." During its deliberations, the jury asked two questions likely related to the Rule 404 (b) evidence — if Appellant was a convicted felon and why Gracie Brown Strong, the victim of one of the other acts, did not testify. The court answered those questions by telling the jury that the evidence was closed and that the verdicts should be based on the evidence presented.

On appeal, Appellant challenges the admission of all nine of the other acts. We will summarize the evidence about each of the

incidents that the trial court admitted at trial and then address whether that evidence was properly admitted for the purposes for which the trial court instructed the jury to consider it. We conclude that the trial court abused its discretion by admitting the other acts evidence. As then explained in Division 3, we also conclude that the improperly admitted evidence could not have been properly admitted under Rule 404 (a). Finally, in Division 4, we conclude that the improper admission of this extensive and highly prejudicial evidence was not harmless error, so Appellant's convictions must be reversed.

(c) *The other acts evidence presented at trial.*

(1) *Four alleged assaults and two alleged threats against Connie Evans between 1991 and 1997.*

Connie Evans, with whom Appellant lived in Miami, Florida, for thirteen years and had three children, testified that on October 28, 1992, as Appellant, Evans, and their children were driving to their house from Evans's mother's house, Appellant stopped the car, told Evans to get out, and then hit her on the arm with a crowbar.

Evans testified that she did not know why Appellant hit her, but she admitted that she told the prosecutor the day before trial that Appellant hit her because he had a bad day at work and was "upset." They resumed driving, and Evans blew the horn to stop a passing police car. The next day, Evans went to the hospital for her injury and received three stitches. The prosecutor asked Evans if she screamed "help me" at the police car; she testified that she did not.

The prosecutor also questioned Evans about an alleged police report which said that on March 8, 1991, Appellant threw a bottle, or "deadly missile," at her. Evans testified that this incident did not happen. She did not admit making a police report and said that if such a report was made, it was a mistake.

Evans acknowledged that on November 2, 1992, she reported to police that Appellant threatened to shoot her with a revolver, but she testified that she had lied about that.

The prosecutor asked Evans about an alleged police report from May 19, 1993, which said that Appellant struck her, but again she testified that nothing happened and did not admit making such

a police report.

Evans testified that on March 11, 1995, she called the police because Appellant kicked in the front door of their house after she locked him out, and when he came inside, he pulled the phone out of the wall. She denied telling the police that Appellant had threatened to kill her.

Finally, Evans testified that on January 18, 1997, Appellant again kicked in their front door after she locked him out. She explained that she did not want him to come in because he had been drinking, and when he drank he would run around with the children, playing and making a mess. When asked about an alleged police report which said that Appellant grabbed her neck and poured a bottle of bleach on her head, she did not admit making such a police report and denied that the alleged assault happened.

When Appellant testified, he admitted that he hit Evans with a crowbar in 1992, but explained that he did so only to knock a small gun that she was holding out of her hand. He acknowledged on cross-examination that before Evans pulled the gun, he had been arguing

with her because she went to her mother's house instead of cooking dinner for him. Appellant testified that he did not throw an object at Evans in 1991 or pour bleach on her in 1997. He testified that Evans used cocaine and drank a lot, and he admitted that he kicked down the door to their house when Evans locked him out in 1995 and 1997, but he explained that in 1997, he was concerned about their children and Evans's drug problem.

The State presented no police reports and no evidence that Appellant was ever charged or convicted in relation to any of these six incidents.

(2) *Alleged shooting of Anthony Fortson in 1994, leaving him hospitalized for a month.*

Anthony Fortson testified that on January 15, 1994, he was leaving the convenience store in Miami where he usually bought snacks when Appellant pulled up in a car with a woman crying and stopped in front of him. Appellant asked the woman, "Was that him?" The woman said, "Yeah," and Appellant asked Fortson, "Where the keys at?" Fortson, who was 18 years old and had never

met Appellant before, did not know what Appellant was talking about. Appellant reached for a gun, and Fortson began running. Appellant drove after him, then got out of the car and shot at him. Fortson was hit in the back; he was hospitalized for a month. Fortson testified that he was completely sure Appellant was the shooter, but he acknowledged that he had never seen Appellant before, that it was dusk at the time of the shooting, and that he saw the driver and shooter for only ten or fifteen seconds.

The investigator on Fortson's case testified that she linked Appellant to the shooting because some papers with Appellant's name and address fell out of the car. When she showed Fortson a photographic lineup three days after the shooting, he identified Appellant as his shooter.

In response, Appellant testified that he drove his friend Gene and Gene's date, Gwen, to the convenience store. Appellant went into the store to buy beer; Gene and Gwen stayed in the car, with Gene lying down sleeping on the backseat. Gwen then came running into the store and told Appellant that two men were doing something

to Gene. As Appellant came out of the store, he saw one man run from the car. The man had taken money out of the sleeping Gene's pocket. Appellant saw Fortson take the keys out of the ignition and some papers from the glove compartment and then run away. Gene, who had woken up, told Appellant to catch them, and Appellant drove after them. (Appellant explained that the keys did not have to be in the ignition to start the car.) As they approached Fortson, Gene shot down the street at him. Appellant had not known that Gene had a gun and told Gene to stop shooting. Appellant then drove Gene and Gwen home. Appellant did not know that Fortson had been hit.

The State presented no evidence that Appellant was ever charged or convicted in relation to this incident.

(3) *Alleged assault on Gracie Brown Strong in 2001, breaking her neck and leaving her paralyzed.*

A sergeant from the Miami Police Department testified that he investigated an incident on January 11, 2001, in which Appellant had allegedly assaulted his then-wife Gracie Brown Strong and broken her neck, which resulted in her being paralyzed from the

neck down.[13] When the sergeant questioned Appellant, Appellant said that he and Gracie had been drinking and doing cocaine. Appellant went to bed, but Gracie would not. She tried to leave their apartment, and Appellant sought to prevent her by "grabbing and hugging her." During this struggle, she fell to the floor three times and Appellant kept picking her up. After the third fall, he put her on the bed. She said she could not move and "he had done this to her." After a few hours, she told Appellant to call 911, which he did. At the hospital, Gracie kept screaming at Appellant, "You did this to me. You hurt me." After Gracie was admitted to the hospital, Appellant left and did not return to visit.

During the police interview, Appellant called Gracie a "dead f**k and a dead piece of a**" but also said that she was a "good person" and that "she kept the house clean, she cooked, [and] she did the wash." The sergeant said that during the interview, he found Appellant to be a little "cocky, arrogant, [and] self-serving." The

---

[13] Gracie later died from her injuries, but that information was not presented to the jury.

sergeant also testified that Appellant had a reputation in the community for being violent, short-fused, and easily angered if people did not agree to do things the way he wanted.

The State also presented the "previous testimony" from a "previous occasion" of a girl who was 14 years old at the time of the paralysis incident and lived in Appellant and Gracie's apartment building.[14] On January 11, 2001, the girl heard a woman repeatedly screaming, "Call 911," and when she looked outside, she saw a woman lying on her back with the top half of her body outside the apartment and a man standing and holding her legs inside the apartment. It looked like he was trying to pull her. The woman was wearing underwear and the man was wearing a shirt and underwear.

In response, Appellant testified at trial that Gracie had been smoking marijuana, drinking wine, and doing cocaine on the night

---

[14] This hearsay evidence was admitted under the exception to the hearsay rule for prior testimony after the State was unable to locate this witness. See OCGA § 24-8-804 (a) (5), (b) (1). Outside the presence of the jury, the prosecutor explained to the trial court that the testimony was given in the criminal case against Appellant related to the incident.

she was injured. Appellant was outside the apartment when he heard a boom. Gracie had fallen over a chair and hit her head "at a bad angle." Her legs were by the door, so it was difficult for Appellant to get the door open. Once he got inside the apartment, he picked her up. She was yelling, "[C]all 911"; he thought she was drunk and put her to bed. She later said that she was hurt, and he called 911. The EMT who did the initial check on Gracie said that she was not paralyzed. They could not fit the stretcher through the door, so they had to put Gracie on a bed sheet and maneuver her out in a "snake-like" motion. At the hospital, Gracie started screaming, "[L]ook what you did to me," and Appellant told her that she was drunk and fell. Gracie admitted that she fell and hurt herself when her deposition was later taken in the hospital in front of a judge by Appellant's lawyer and the state's attorney.

Appellant did not offer this alleged deposition into evidence. It appears that the deposition may have been taken as part of his prosecution for crimes associated with Gracie's injuries. From discussions held outside the presence of the jury, it appears that

Appellant's trial for those crimes resulted in some convictions, but he was later granted a new trial. The record does not indicate what happened after that, and the jury heard no evidence that Appellant was ever charged or convicted in relation to this incident.

(4) *Alleged beating of Ashanti Magee in 2012.*

Ashanti Magee testified that on October 26, 2012, she worked for Appellant's lawn business in Smyrna, and that afternoon Appellant drove her and two co-workers home. After the co-workers got out of Appellant's truck, he held her back. He said that he wanted to have a drink with her before he paid her for the day and that he "wanted to put twins in [her]." Magee was uncomfortable with Appellant's advances. She got out of the truck and walked into the house. Appellant followed her. Inside the house, Appellant picked up a pool cue and broke it across Magee's chest. She fell to her knees. When she stood back up, Appellant struck her with the cue behind her ears and across her head. She then defended herself with a knife, and he left.

After some time went by, Appellant and Magee got in contact

again through a mutual friend, and Appellant apologized. Magee, who needed a job, started working for him again. Appellant drove her to his lawyer's office and convinced her to sign an agreement that she would not prosecute him for the earlier incident. In this sworn statement, she said that she was "intoxicated and very confused," that Appellant did not grab her by the neck or hit her with a pool cue, and that she did not feel threatened by Appellant. Magee testified at trial that the sworn statement was "not true."

One of the co-workers, Vance Hofstadt, testified about the incident as follows. He was in his room at the house when he heard banging. He came out and saw Appellant with a pool cue in his hand and Magee under the table. Hofstadt tackled Appellant. He could see that Appellant was trying to hit Magee, but he did not see Appellant actually hit her. Magee was hurt and crying and said that she had been hit. Hofstadt thought that Appellant had been drinking. Hofstadt testified that when Appellant drank, he was arrogant and had a quick temper.

In response, Appellant testified that Magee and Hofstadt were

dating and used crack cocaine. Appellant kept her in the truck to encourage her to stop using drugs. She reacted poorly and went into the house, taking Appellant's pocketknife, a few dollars from his ashtray, and a memento he kept on the dashboard. Appellant followed her to ask her to give those items back. In the house, Hofstadt became belligerent and advanced toward Appellant. They tussled, Hofstadt grabbed the pool cue, Appellant took it from Hofstadt and swung it, Hofstadt ducked, and the stick hit Magee. Magee then pulled out her knife and stabbed Appellant while Hofstadt and another man held Appellant. On cross-examination, Appellant said that he did not make a sexual advance toward Magee but rather told her that she needed some man to have children with her so she would settle down and stop using drugs. He also offered to take her to a drug rehab facility. When Magee got in contact with him later, she said that she was trying to stay off crack and agreed to go to Appellant's attorney's office to fix the situation.

The State presented no evidence that Appellant was ever charged or convicted in relation to this incident.

(d) *The trial court's error in admitting the other acts evidence.*

The trial court admitted all of this other acts evidence for the purposes of proving Appellant's intent, disproving self-defense, showing Appellant's motive, and disproving mistake or accident. We will consider each of these purposes as it relates to the alleged acts, focusing on the first and second parts of the Rule 404 (b) test. Appellant does not argue that any of the other acts should have been excluded based on the third part of the test, and the State's pretrial proffer was sufficient for the trial court to conclude that a reasonable jury could find by a preponderance of the evidence that Appellant committed the alleged acts.[15]

---

[15] We note, however, that there was no evidence presented at trial to support the State's pretrial proffer that Appellant threw a bottle at Evans in 1991, that he struck her in 1993, that he threatened her in 1995, or that he poured bleach on her in 1997. Although the State presented police reports supporting most, if not all, of these allegations to the court before trial, the State did not introduce those reports during the trial, and Evans did not admit that those reports exist. The prosecutor's questions may have implied that Appellant committed these acts, but a prosecutor's questions are not evidence. See *Green v. State*, 299 Ga. 337, 339 (788 SE2d 380) (2016). Because there was no evidence presented to the jury that Appellant committed these acts against Evans, we need not decide whether their admission into evidence would have been improper under Rule 404 (b), although we note that they likely were inadmissible for the same reasons that the other acts we discuss below were inadmissible.

(1) *Intent and self-defense.*

"[T]he relevance of other acts evidence offered to show intent is established when the [other] act was committed with the same state of mind as [a] charged crime." *Naples v. State*, 308 Ga. 43, 51 (838 SE2d 780) (2020). See also *Olds*, 299 Ga. at 72 ("[E]vidence that an accused committed an intentional act generally is relevant to show . . . that the same defendant committed a similar act with the same sort of intent . . . ."). To prove that Appellant committed the charged crime of malice murder of Maurice, the State had to prove that Appellant acted with the malicious intent to kill Maurice, see OCGA § 16-5-1 (a), (b), and to prove that Appellant committed the charged crime of aggravated battery against Deandre, the State had to prove that Appellant acted with malicious intent to injure Deandre, see OCGA § 16-5-24 (a). To prove Appellant's commission of the charged aggravated assaults, the State had to prove that Appellant used the knife against Maurice and Deandre with the intent either to violently injure them or to commit an act that placed them in reasonable apprehension of immediately receiving a violent injury.

See OCGA §§ 16-5-20 (a); 16-5-21 (a) (2). See also *Jackson v. State*, 306 Ga. 69, 78 (829 SE2d 142) (2019) ("[A]ssault with the aggravating factor of use of a deadly weapon is a general intent crime." (citation and punctuation omitted)).

There was sufficient evidence that Appellant had the malicious intent to injure when he hit Evans with a crowbar, shot Fortson in the back (which also evidenced the malicious intent to kill), grabbed and tackled Gracie so violently that her neck was broken and she was paralyzed, and broke a pool cue across Magee's chest and head, and that Appellant had the general intent to assault the victims in those incidents as well as when he threatened to shoot Evans. Accordingly, the evidence regarding those other acts was relevant under Rule 401 to proving Appellant's intent with regard to the charged crimes, so the first part of the Rule 404 (b) admissibility test was satisfied.[16]

---

[16] As explained in footnote 15 above, the State's *proffered* evidence of the other four incidents involving Evans also would involve the malicious or general intent to harm her, but no *actual* evidence of those assaults was presented to the jury. The evidence that was presented to the jury — that

Turning to the Rule 403 analysis required by the second part of the test, in determining the probative value of other acts evidence offered to show intent, courts should consider the prosecutorial need for the other acts evidence, its similarity to the charged crimes, and its temporal remoteness. See *Jackson*, 306 Ga. at 77. None of those factors supports a determination that the other acts evidence that the trial court admitted had any significant probative value in proving Appellant's intent with respect to the crimes alleged in this case.

To begin with, although Appellant put his intent at issue by pleading not guilty, see id., the State's need for evidence to prove his intent was "extremely low" because his sole defense at trial was self-defense. *Brown v. State*, 303 Ga. 158, 162-163 (810 SE2d 145) (2018). The State was required to disprove self-defense, but the other acts evidence was minimally probative on that question. As we have previously explained, when a defendant "did not deny the intent to

Appellant kicked in the door to their house and pulled the phone off the wall in 1995 and again kicked in their door in 1997 — did not indicate an intent at issue in the charged crimes.

inflict injury, but claimed authority for the act under the legal excuse of reasonable fear of immediate serious harm to [him]self . . . , the only factual issue in the case was whether self-defense was the reason for the admitted act." Id. (citations and punctuation omitted). The fact that Appellant may have committed violent crimes against other people many years earlier "had nothing to do with his reason for [stabbing] the victim[s], and really has no purpose other than to show [A]ppellant's propensity toward violence." Id. at 163 (citations and punctuation omitted).

Moreover, the other acts had few similarities to, and major differences from, the charged crimes. See *Brooks v. State*, 298 Ga. 722, 725-726 & n.10 (783 SE2d 895) (2016) (explaining that a "major difference" between Georgia's current Evidence Code and our old "similar transaction" case law is the need under Rule 404 (b) to consider the dissimilarities as well as the similarities between the extrinsic act and the charged act). The incidents involved different weapons used against different types of victims under disparate circumstances. In the charged crimes, Appellant used a knife to stab

his wife's adult son and adult grandson in the house in Cobb County where they all lived because the men had not washed some dirty dishes. By contrast, in the other alleged incidents, Appellant used a crowbar to hit his domestic partner (Evans) outside their car in Miami because he was upset after a bad day at work, and he threatened to use a revolver against her in another incident;[17] more than a year later, Appellant used a gun on the street outside a convenience store to shoot a complete stranger (Fortson) in the back because he suspected the man had stolen his keys; seven years after that, Appellant used his bare hands to tackle his wife (Gracie) when she tried to leave their apartment, breaking her neck and paralyzing her; and more than a decade later, he used a pool cue to beat an employee (Magee) in her house in Smyrna after she rejected his sexual advance. Finally, none of the incidents were close in time to the August 2015 crimes charged in this case, and most of them were

---

[17] As discussed above, the only evidence of this incident was Evans's acknowledgment that she reported such a threat to the police. Because the police report was not introduced into evidence and Evans testified that the incident never happened, the jury knew nothing more about the circumstances.

extremely remote; they ranged from three years before (Magee) to 14 years before (Gracie) to more than two decades before (Evans and Fortson).

Any probative value of this extensive other acts evidence was wholly outweighed by its extreme and unfair prejudicial impact. The charged stabbings were, the State and Appellant agreed, the result of an argument between adult men who lived together. The other acts evidence portrayed Appellant as someone who had hit his domestic partner with a crowbar and threatened to shoot her; had shot a teenager in the back for possibly stealing his keys, leaving the victim hospitalized for a month; had broken the neck of his former wife, leaving her permanently paralyzed; and had beaten his female employee with a pool cue for rejecting his sexual advance. To make matters worse, as far as the jury knew, Appellant had escaped any punishment for this litany of (in the State's view of the evidence) attempted murder, aggravated batteries, and aggravated assaults. See *Jackson*, 306 Ga. at 79-80 (explaining that the lack of evidence that the defendant had been prosecuted, admitted his guilt, and

served a sentence for his other criminal act "increased the risk that the jury would want to punish [him] for his past conduct rather than only for the charged crimes"); *United States v. Beechum*, 582 F2d 898, 914 (5th Cir. 1978) (noting that the danger that the jury may convict the defendant due to an uncharged offense "is particularly great where, as here, the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged").[18]

For these reasons, the trial court abused its discretion by admitting evidence of these other violent acts to show Appellant's intent or to negate self-defense. See *Jackson*, 306 Ga. at 79; *Brown*, 303 Ga. at 163; *Parks v. State*, 300 Ga. 303, 308 (794 SE2d 623) (2016).

---

[18] We recognize that the jury was instructed to consider the other acts evidence only as to the crimes charged, but given the seriousness of most of the multiple uncharged acts and the lack of evidence that Appellant faced punishment for any of them, the usual presumption that the jury could follow its instructions cannot be indulged here. See *Hood v. State*, 299 Ga. 95, 105 (786 SE2d 648) (2016). See also *Jones v. State*, 292 Ga. 656, 662 (740 SE2d 590) (2013) (holding that the trial court's instruction that the attorney's arguments were not evidence was inadequate to ensure that the jurors did not consider the prejudicial material mentioned by the prosecutor during his closing argument).

(2) *Motive.*

To properly show motive, "the extrinsic evidence must be logically relevant and necessary to prove something other than the accused's propensity to commit the crime charged." *Kirby*, 304 Ga. at 486-487 (citation and punctuation omitted). The State has argued that the evidence of Appellant's other violent acts was relevant to show that his "motive is to control other people" with violence – "whenever a person doesn't submit to his control, he reacts with violence." That "is a classic improper propensity argument, focusing on Appellant's violent . . . character and identifying his motive to act in far too generic a fashion." Id. at 487.[19] Accordingly, the trial court also abused its discretion by admitting the other acts evidence to show Appellant's motive. See id.

---

[19] As the State points out, this Court has held that domestic violence may be motivated by a defendant's desire to control his intimate partner with threats and assaults. See *Smart v. State*, 299 Ga. 414, 418-419 (788 SE2d 442) (2016). But while Evans and Gracie were Appellant's former intimate partners, the victims in this case — his partner's adult son and adult grandson — were not. Moreover, any theory that control of household members generally was Appellant's motive is belied by the other acts evidence related to Fortson (a stranger to Appellant) and Magee (an employee of Appellant).

(3) *Mistake and accident.*

The trial court also admitted the other acts evidence to disprove mistake and accident. As discussed above, Appellant's sole defense theory was self-defense; there was no contention that he stabbed Maurice and Deandre by mistake or accident, and the jury was given no instructions on those issues. Thus, the State had no need for evidence to disprove mistake or accident, and the trial court abused its discretion by admitting the other acts evidence for these purposes as well. See *Thompson v. State*, 302 Ga. 533, 541 (807 SE2d 899) (2017); *Parks*, 300 Ga. at 306.

In conclusion, because the evidence of Appellant's other violent acts was not properly admitted for any purpose for which the jury was instructed to consider it, its admission under Rule 404 (b) was error.

3. *The other acts evidence was not admissible under Rule 404 (a).*

On appeal, the Attorney General (but not the District Attorney) argues that even if the evidence of Appellant's other acts was not

admissible under Rule 404 *(b)*, it was admissible as evidence of Appellant's violent character under Rule 404 *(a)* after Appellant introduced evidence of Maurice's violent character. As mentioned above, the trial court implicitly rejected this argument at trial and instructed the jury that it could consider the evidence only for (improper) Rule 404 (b) purposes and could *not* "infer from that evidence that the defendant is of a character that he would commit such crimes." In its order denying Appellant's motion for new trial, however, the trial court held that the evidence was admissible under Rule 404 (a) as well as Rule 404 (b). We doubt that the trial court could salvage its admission of the other acts evidence in this post-hoc way, especially considering the contrary instructions given to the jury; indeed, on appeal the District Attorney agrees with Appellant that the evidence was not admissible under Rule 404 (a). In any event, as we will explain, the Attorney General's argument is meritless.

Under Rule 404 (a) (1) and (2), evidence of a "pertinent trait of character" of the defendant or of the alleged victim is admissible

when offered by the defendant or by the State in rebuttal. OCGA §

24-4-404 (a) (1), (2). However, under OCGA § 24-4-405 ("Rule 405"),

such character traits generally may be proved only with "testimony

as to reputation or testimony in the form of an opinion[,]" OCGA §

24-4-405 (a), although Rule 405 (b) provides an exception to this

rule: a character trait may be proved by specific instances of the

person's conduct when the character trait "is an essential element of

a charge, claim, or defense or when an accused testifies to his or her

own character," OCGA § 24-4-405 (b).[20]

---

[20] OCGA § 24-4-404 (a) says in full:
  (a) Evidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion, except for:
    (1) Evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same; or if evidence of a trait of character of the alleged victim of the crime is offered by an accused and admitted under paragraph (2) of this subsection, evidence of the same trait of character of the accused offered by the prosecution;
    (2) Subject to the limitations imposed by Code Section 24-4-412, evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused or by the prosecution to rebut the same; or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor[;]
    (3) Evidence of the character of a witness, as provided in

In this case, Rule 404 (a) (2) allowed Appellant to offer evidence of Maurice's violent character, as that trait was pertinent to Appellant's claim of self-defense. Under Rule 405, however, Maurice's character trait could be proved only with reputation and opinion testimony, because a victim's violent character is not an *essential element* of a self-defense claim. See *United States v. Gulley*, 526 F3d 809, 819 (5th Cir. 2008) (pointing out that "a self defense claim may be proven regardless of whether the victim has a violent or passive character," and collecting federal cases on this issue). See

Code Sections 24-6-607, 24-6-608, and 24-6-609.
OCGA § 24-4-405 says in full:

> (a) In all proceedings in which evidence of character or a trait of character of a person is admissible, proof shall be made by testimony as to reputation or by testimony in the form of an opinion.
> (b) In proceedings in which character or a trait of character of a person is an essential element of a charge, claim, or defense or when an accused testifies to his or her own character, proof may also be made of specific instances of that person's conduct. The character of the accused, including specific instances of the accused's conduct, shall also be admissible in a presentencing hearing subject to the provisions of Code Section 17-10-2.
> (c) On cross-examination, inquiry shall be allowable into relevant specific instances of conduct.

The Attorney General does not argue that Appellant's testimony put his character at issue or that OCGA § 24-4-405 (c) applies.

also *Mohamud v. State*, 297 Ga. 532, 536 (773 SE2d 755) (2015); Ronald L. Carlson & Michael Scott Carlson, Carlson on Evidence 128 (6th ed. 2018).[21]

Thus, although the trial court issued a pretrial order purporting to admit evidence regarding two specific instances of Maurice's conduct – the 2010 gun-pointing incident and the 2014 death threat discussed in Division 1 above – under Rules 404 (a) and 405, those specific acts were not properly admissible as character evidence. See *Timmons v. State*, 302 Ga. 464, 468-469 (807 SE2d 363) (2017). Moreover, although the order referred to those rules, it did not describe the incidents as character evidence. Instead, the order said that evidence of the two specific instances was admissible because it was "relevant and probative as to the defendant's fear, apprehension of danger, and reasonableness of his defensive

---

[21] OCGA §§ 24-4-404 (a) and 24-4-405 closely track their counterparts in the Federal Rules of Evidence, so we look to federal appellate decisions applying these federal rules for guidance in interpreting the Georgia statutes. See *Timmons v. State*, 302 Ga. 464, 468-469 (807 SE2d 363) (2017). See generally *State v. Almanza*, 304 Ga. 553, 555-559 (820 SE2d 1) (2018).

measures."[22]

To the extent that the evidence of Maurice's two threatening acts was admitted for a purpose other than showing his character trait, it did not come within Rule 404 (a) (2) and did not allow the State to present evidence of Appellant's same character trait in rebuttal under Rule 404 (a) (1). See OCGA § 24-4-404 (a) (1) ("[I]f evidence of a trait of character of the alleged victim of the crime is

---

[22] Although this Court has not yet decided whether, under the current Evidence Code, a victim's specific acts of violence of which the defendant had personal knowledge may be admissible to show the defendant's state of mind with respect to a claim of self-defense, we have repeatedly noted that possibility. See, e.g., *White v. State*, 307 Ga. 882, 885 (838 SE2d 828) (2020); *Williams v. State*, 301 Ga. 712, 715 n.3 (804 SE2d 31) (2017); *Mohamud*, 297 Ga. at 536 n.2. Federal courts have upheld the admission of such evidence. See, e.g., *United States v. Bordeaux*, 570 F3d 1041, 1051 (8th Cir. 2009) ("[E]vidence of victim's prior bad acts 'is only admissible to the extent a defendant establishes knowledge of such prior violent conduct at the time of the conduct underlying the offense charged.'" (citations omitted)); *United States v. Saenz*, 179 F3d 686, 689 (9th Cir. 1999) (holding that "a defendant claiming self defense may show his own state of mind by testifying that he knew of the victim's prior acts of violence" and by presenting "extrinsic corroborating evidence of the victim's [known] acts of violence"). Additionally, because these two threats were against Appellant, they may have been admissible to show Maurice and Appellant's relationship. Cf. *Flowers v. State*, 307 Ga. 618, 621 (837 SE2d 824) (2020) (holding that evidence of a defendant's prior acts toward a victim may be admissible where the nature of the relationship between the defendant and the victim sheds light on the defendant's motive in committing the charged offense). We need not decide whether this evidence was properly admissible for such non-character purposes, however, because the State did not challenge the trial court's order admitting these acts.

offered by an accused and *admitted under paragraph (2) of this subsection*, evidence of the same trait of character of the accused offered by the prosecution [is admissible]." (emphasis added)). See also Advisory Committee Note on the 2000 amendment of Federal Rule of Evidence 404 (explaining that Federal Rule 404 "does not permit proof of the accused's character if the accused merely uses character evidence for a purpose other than to prove the alleged victim's propensity to act in a certain way"). And to the extent that the trial court erroneously allowed Appellant to present evidence of Maurice's prior threatening acts as character evidence, the State's recourse was to object to the admission of that evidence, not to introduce *more* inadmissible evidence in the form of specific prior violent acts by Appellant.

The Attorney General also argues that Appellant presented evidence of Maurice's violent character through Appellant's cross-examination of Detective Hill, when the detective testified that Deandre said in an interview that Maurice liked to "punch things when he g[ot] mad" and was known for starting fights with the

police. Assuming without deciding that this was reputation character evidence admissible under Rules 404 (a) (2) and 405 (a), the State could then rebut it with evidence of Appellant's violent character under Rule 404 (a) (1). See *United States v. Caldwell*, 257 Fed. Appx. 764, 767 (5th Cir. 2007) ("Pursuant to Federal Rule of Evidence 404 (a) (1), if evidence pertaining to a victim's violent character is allowed, then evidence of the assailant's violent character is also admissible."). However, any such rebuttal evidence, just like any initial evidence of Maurice's character trait, would be limited by Rule 405 (a) to reputation and opinion testimony.

Only two snippets of the voluminous other acts evidence might qualify as reputation or opinion testimony — the testimony from the Miami police sergeant who interviewed Appellant about Gracie that Appellant had a reputation in the community for being violent, short-fused, and easily angered; and the testimony from Hofstadt, the other employee who testified about Appellant's alleged beating of Magee, that Appellant had a quick temper when he drank. Those few lines of testimony might have been admissible under Rule 404

(a) (1) as rebuttal character evidence, but the remaining 200-plus pages of testimony about Appellant's specific acts of violence were not admissible under this theory. For these reasons, the Attorney General's argument that the evidence of Appellant's prior violent acts was admissible under Rule 404 (a) is meritless.

4. *The improper admission of the other acts evidence was not harmless.*

The trial court's errors in admitting the other acts evidence require reversal of Appellant's convictions unless they can be deemed harmless, meaning that "'it is highly probable that the error did not contribute to the verdict.'" *Brown*, 303 Ga. at 164 (citation omitted). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."). "'In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict.'" *Thompson*, 302 Ga. at 542 (citation

omitted). The evidentiary errors here were not harmless.

In this case, the analysis of the harm caused by the erroneous admission of the other acts evidence encompasses the Rule 403 analysis in Division 2 (d) (1) above of the undue prejudice resulting from the admission of that evidence. We again consider the severity of the prior acts and their resulting injuries — particularly the month-long hospitalization caused by Appellant's shooting Fortson in the back and the permanent paralysis caused by Appellant's breaking Gracie's neck — as well as the absence of evidence that Appellant was ever punished in any way for those many serious crimes. The multitude of improperly admitted other acts, and the severity of those two acts, distinguishes this case from those in which the improper admission of a single, less severe other act was deemed harmless. See, e.g., *Jackson*, 306 Ga. at 80. See also *State v. Lane*, 308 Ga. 10. 14 (838 SE2d 808) (2020) (holding that the prejudicial effect of multiple evidentiary errors must be considered cumulatively). Nor is this a case in which evidence erroneously admitted under Rule 404 (b) was largely cumulative of other,

properly admitted evidence. See, e.g., *Kirby*, 304 Ga. at 487. Moreover, because the evidence of Appellant's prior acts of violence was admitted, evidence intrinsic to those incidents that indicated his bad character in other dimensions was also admitted, including evidence of his use of cocaine with Gracie and his crude sexual advance to Magee.

Another important aspect of the other acts evidence in this case was the lack of definitive proof that Appellant actually committed the numerous prior criminal acts that the State alleged. He had not been charged with or convicted of any of those alleged crimes (at least as far as the jury knew), and he had not previously admitted committing any of them. As a result, Appellant's trial for the charged crimes predictably devolved into a series of mini-trials of him for crimes allegedly committed against four other victims years or decades in the past (crimes that if he did commit, he had gotten away with scot-free unless the jury in this case imposed the punishment). Federal courts applying Rule 404 (b) have recognized the risk of jury confusion and unfair prejudice inherent in this

situation. See, e.g., *United States v. Cook*, 454 F3d 938, 942 (8th Cir. 2006) ("[T]he government's expansive Rule 404 (b) evidence presented the prospect of mini-trials over the events underlying three prior convictions for five relatively remote drug transactions . . . . This posed a substantial risk of distracting the jury from its central task of determining whether it was [the defendant] who possessed the distribution quantity of crack cocaine found on the night stand."); *United States v. Gilbert*, 229 F3d 15, 24 (1st Cir. 2000) ("This is not a situation where the 'extrinsic act' is conceded by all to have taken place. . . . It is thus nearly certain that there would be a mini-trial on whether the attempt actually took place. . . . We think that the potential for confusion of the issues and for unfair prejudice in such a scenario is manifest.").[23]

The State emphasized the other acts evidence in its rebuttal closing argument, including by arguing that the evidence showed that Appellant always tried to avoid blame — an argument that

---

[23] This "mini-trial" risk is also properly taken into account in the Rule 403 analysis of proposed other acts evidence.

served to remind the jury of the lack of evidence that Appellant had paid a price for his prior violent acts. Finally, the jury's questions during deliberations about whether Appellant was a convicted felon and why Gracie did not testify indicate that the jury devoted its attention to the erroneously admitted evidence.

The high risk of prejudice and confusion from the erroneously admitted evidence might be offset only by the most compelling properly admitted evidence of guilt. But as the District Attorney candidly admits in his brief here, the evidence that Appellant did not act in self-defense was not overwhelming.[24] There was no dispute that Appellant stabbed Maurice and Deandre, but the circumstances of the stabbings were disputed between the State's two eyewitnesses, Deandre and Day, and the only other eyewitness, Appellant. The forensic evidence indicated that either of their versions of events could be true. Deandre did not see whether Appellant or Maurice initiated the physical fight on the porch, and

---

[24] Tellingly, the Attorney General makes no argument in his brief here that if the other acts evidence was improperly admitted, the error was harmless.

he acknowledged that he grabbed Appellant from behind during the altercation (trying to stop Appellant from hurting Maurice); Deandre's initial account to Detective Hill also included a woman whom no one else mentioned and the police could not find, and a doctor who treated Deandre testified that he was given pain medication that could affect his short-term memory. Maurice's friend Day was not on the porch, and he provided inconsistent accounts about whether Appellant or Maurice was the first aggressor. Appellant provided a not-outlandish account of the incident, and he did not flee or try to hide the knife after the stabbings. Indeed, the jury acquitted him of the malice murder and aggravated battery charges.

In sum, although the jury could have found Appellant guilty if it believed the State's witnesses and disbelieved Appellant, we cannot say that it is highly probable that the trial court's erroneous admission of the voluminous evidence that Appellant had previously committed multiple serious violent acts did not contribute to the guilty verdicts that the jury returned. Accordingly, we reverse

Appellant's convictions.[25]

*Judgment reversed. All the Justices concur.*

DECIDED JUNE 29, 2020.
Murder. Cobb Superior Court. Before Judge Clark.
*Strickland Webster, Sydney R. Strickland*, for appellant.
*Joyette M. Holmes, District Attorney, Linda J. Dunikoski, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.

---

[25] Because the evidence was legally sufficient to sustain Appellant's convictions, see Division 1 above, the State may choose to retry him on the offenses for which there was a guilty verdict. See *Sheard v. State*, 300 Ga. 117, 121 n.5 (793 SE2d 386) (2016).